FILED
11/20/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 18, 2025 Session

## BETTY MALIA BRYANT v. SHELBY COUNTY GOVERNMENT, ET AL.

Appeal from the Chancery Court for Shelby County
No. CH-21-0922     Melanie Taylor Jefferson, Chancellor

————————————————————

### No. W2024-00953-COA-R3-CV
————————————————————

This appeal arises from a petition for judicial review of a decision of the Shelby County Civil Service Merit Board.  The appellant worked as a cashier for the Shelby County Trustee's Office and was terminated after she experienced a cash shortage and attempted to force balance.  The Civil Service Merit Board conducted a review hearing and upheld the termination. The appellant sought judicial review in the chancery court, which likewise upheld the termination.  The appellant filed this appeal claiming that her procedural due process rights were violated, her termination was not in accordance with the policies and procedures of Shelby County, and that the Civil Service Merit Board's decision was arbitrary and capricious.  Discerning no error, we affirm.

**Tenn. R. App P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KRISTI M. DAVIS, J., joined.

Maureen Truax Holland and Yvette H. Kirk, Memphis, Tennessee, for the appellant, Betty Malia Bryant.

Katherine L. Frazier and R.H. "Chip" Chockley, Memphis, Tennessee, for the appellees, Shelby County Government, and Shelby County Trustee.

OPINION

### I. FACTS & PROCEDURAL HISTORY

Betty Malia Bryant was employed as the lead cashier at the Shelby County Trustee's Office.  Ms. Bryant's primary duty was to process tax payments submitted during the Shelby County tax season, which runs from the beginning of October through the end of

February. During tax season, Ms. Bryant worked at "roving locations" throughout Shelby County including locations in Whitehaven, Collierville, Bartlett, and Germantown. The incidents leading to the present proceedings began occurring during the 2018-2019 tax season. On February 18, 2019, Ms. Bryant received a "Disciplinary Action Form" after she experienced a $100 cash shortage. The form stated that Ms. Bryant had engaged in "neglect or carelessness resulting in damage to county property" and "[u]nsatisfactory work." She received an oral reprimand as discipline. Shortly thereafter, Ms. Bryant received a second disciplinary form regarding two additional cash shortages that both occurred on February 27, 2019. When combined, the shortages totaled $500. As punishment, Ms. Bryant was issued a written reprimand and was placed on probation for 12 months. The remainder of the tax season appears to have proceeded without incident.

Subsequently, Ms. Bryant met with her superiors for a regular end-of-season review. Ms. Bryant was asked to make suggestions that she believed would improve working conditions. One of Ms. Bryant's duties was to transport any cash payments accepted throughout a workday to the bank for deposit. She informed her superiors that she believed cashiers transporting money needed to be provided with security escorts. Conversations regarding this topic continued throughout the following months, and eventually, police escorts were arranged for both the Bartlett and Collierville locations. The Whitehaven location did not require an escort because it was located inside a branch of the bank at which the deposits were to be made. However, neither the Germantown Police Department nor the Shelby County Sheriff's Department would agree to provide a regular escort for the worker at the Germantown location. Instead, Ms. Bryant's superiors agreed to take turns escorting her on days when she worked at the Germantown location. The 2019-2020 tax season began, and Ms. Bryant worked at the Germantown location each Monday. For several weeks, she would communicate with her superiors regarding the escort, but none would be provided due to scheduling conflicts or other such issues. Despite this, Ms. Bryant continued to transport the deposits to the bank at the end of each workday.

On January 13, 2020, Ms. Bryant again worked at the Germantown location. The manager scheduled to escort Ms. Bryant signaled she was going to leave a meeting with her own superior in order to travel to the Germantown location. She informed her superior that she was going to escort Ms. Bryant to the bank but was told by her superior, "[n]o, no, you are not." Subsequently, the parties met with the Shelby County Trustee ("the Trustee"), and they called Ms. Bryant to inform her that no escort would be provided. Ms. Bryant became upset, and she told the Trustee that she was concerned about her safety. She agreed to take the deposits to the bank that day but claimed she would not do so in the future. Shortly thereafter, Ms. Bryant was sent a letter identifying her decision to inform leadership that she would no longer perform a regular job duty as insubordination. The letter also noted that she "became disgruntled and insubordinate to not only [the Trustee], but other leadership; going as far as to state what [she] would not do and what leadership will do in a manner that lacked respect, team work [sic] and collaboration." The letter stated that it was a "final warning for Insubordination" and noted "any other occurrences

- 2 -

of insubordination, unprofessional conduct or performance problems here after" would subject Ms. Bryant "to disciplinary action up to and including termination."

Unfortunately, on February 24, 2020, Ms. Bryant experienced another cash shortage. Ms. Bryant later claimed to have "found" the missing money in her work bag. The shortage initially appeared to be in the amount of $67.78. However, it was quickly discovered that while Ms. Bryant had experienced a shortage of approximately $9.78, a computer "glitch" had caused the remaining shortage. Ms. Bryant later admitted that she had not "found" the missing money but had been attempting to "force balance" by replacing it with her own. Ms. Bryant was suspended and shortly thereafter sent a "Loudermill" letter informing her of "the possibility of major discipline" due to her "inability to perform the duties of [her] position in a satisfactory manner over a course of employment." The letter stated that the proposed discipline stemmed from Ms. Bryant's "[i]nability to perform the duties of [her] position in a satisfactory manner over a course of employment" and specifically referenced "Shelby County Policy #703, page 2, #2, 'Acts of incompetence'" as the description of the charges. In support of the charges, the letter stated that multiple instances of conduct were being considered "including multiple cash shortages, dishonesty in transaction activity, inability to follow Standard Operating Procedures set in place when handling tax payer [sic] payments, and insubordination to management, leadership and elected officials in the process of correcting issues." The letter also noted that "major disciplinary action up to and including termination [was] being considered."

A Loudermill hearing took place on March 9, 2020.[1] During this meeting Ms. Bryant participated in a discussion with two of her superiors regarding the charges. Subsequently, these superiors determined that termination was the appropriate form of discipline. Ms. Bryant appealed this decision to the Shelby County Civil Service Merit Board ("the Board"). The Board held a hearing on the matter on April 1, 2021, in which both Ms. Bryant and the trustee's office were permitted to (1) examine witnesses, (2) submit evidence, and (3) make legal arguments regarding the termination.

Ms. Stephanie Maness was the first witness to testify. Ms. Maness worked as an operations manager in the Trustee's office and was Ms. Bryant's direct supervisor. She began by explaining the incidents that led to Ms. Bryant's termination. She recounted the various cash shortages that occurred in 2019 and explained that these resulted in Ms. Bryant receiving both an oral reprimand and a written reprimand. She also explained that she had attempted to provide Ms. Bryant with certain operating techniques intended to prevent shortages from occurring. However, Ms. Bryant refused to adopt the new operating procedures and did not accept the instructional materials when presented with them. She

---

[1] A Loudermill hearing has been described as "the first hearing in the grievance process, in which the employee is given the opportunity to present reasons why he should not receive the proposed discipline." *Thompson v. Memphis Light, Gas & Water*, 416 S.W.3d 402, 408 n.7 (Tenn. Ct. App. 2011).

- 3 -

noted that Ms. Bryant continued to have problems after the February 2019 incidents and was placed on probation the following summer. Ms. Maness also detailed the events leading to Ms. Bryant's conflict with the Trustee. She explained that she was scheduled to escort Ms. Bryant on the day in question and went to leave a meeting in order to do so. She was questioned about the arrangement by her own superior, at which point they went to discuss the matter with the Trustee. Ms. Bryant was then called and informed that she would not be receiving an escort to make the deposits. Ms. Maness stated that Ms. Bryant agreed to make the deposit that day but said it would be "the last time" she did so. She stated that, during this phone call, Ms. Bryant also claimed that she had had several traumatic experiences, which resulted in her fear of being robbed or harassed while transporting deposits. Ms. Maness explained that this information had not been provided beforehand and was not cited as the basis of the requested security escort during the end-of-season meeting.

Ms. Maness stated that, shortly after these events, Ms. Bryant experienced the $67.78 shortage. She explained that this incident was "odd" because she "was the last person to know anything" despite being "the direct report" for such incidents. She explained that while cashiers were out of balance on occasion, shortages of more than $20 were to be addressed immediately. The policy for that level of outage is "strict," and Ms. Maness explained she needed to be informed of them immediately so she could "address it." She stated that the day after the shortage occurred, "accounting [was] all up trying to figure out what happened with [a] system glitch." Meanwhile, Ms. Bryant claimed that she had "found" the money in her work bag after returning home. Subsequently, the computer issue was resolved, and it was determined that Ms. Bryant's shortage had been in the amount of $9.78 and the remainder had been caused by the computer issue. Ms. Maness confronted Ms. Bryant about the fact that she had claimed to locate a $67.78 shortage when she had only experienced a $9.78 shortage. This indicated that she had attempted to "force balance" which constituted a very serious offense. Ms. Maness did later acknowledge that, in prior years, the office's policy had been for anyone experiencing a shortage to "make up" the difference by paying in their own money. However, this policy had been discontinued prior to these events.

As a result of the February 2020 shortage, Ms. Maness proposed "major discipline," and the Loudermill notice was sent. Importantly, Ms. Maness testified that the Loudermill notice itself served as the written form of discipline for the February 2020 shortage, rather than the issuance of a disciplinary form as had been done previously. Ms. Maness was asked to describe the hearing. She explained that she, Mr. Torrey Harris (a human resources manager), and Ms. Bryant attended the meeting to discuss the incidents which had occurred. Afterward, Mr. Harris and Ms. Maness determined that termination was the appropriate level of discipline. Ms. Maness explained that they considered many of the previous incidents that had occurred when determining the appropriate level of discipline. This included the "final warning" that the Trustee sent to Ms. Bryant after the incident of insubordination, the history of shortages, and the refusal to follow the techniques Ms.

Maness had previously suggested as methods of avoiding future shortages. Ms. Maness stated that she and Mr. Harris had discussed imposing "lesser discipline," but due to the history of "write-ups and discussions, one-on-one counseling," and the provision of the techniques intended to remedy Ms. Bryant's issues, this was not possible. Ms. Maness claimed that even if the incident of insubordination had not been considered, they still would have terminated Ms. Bryant due to her poor job performance.

On cross-examination, Ms. Maness was asked about three end-of-year performance reviews that pertained to Ms. Bryant. These reviews were derived from 2017, 2018, and 2019 respectively. Each performance review contained a manager evaluation. Ms. Bryant scored in the "fully meets standards" range on each of these performance reviews. Ms. Maness acknowledged that she had generated and signed these performance reviews.

Mr. Harris testified next. Mr. Harris explained that, after the Loudermill hearing took place, he and Ms. Maness determined that termination was the appropriate level of punishment for Ms. Bryant. He stated that termination was appropriate because "[Ms. Bryant] was not capable of actually doing this role." He further explained that there was no lower-level position in which she could have been placed.

Mr. Harris was next asked about Shelby County Policy 703. This policy provides that:

[e]very supervisor is expected to discuss improper or inadequate performance with the employee in order to correct deficiencies and to avoid the need to exercise disciplinary action. All disciplinary action shall be documented and the original signed copy sent to the employee's Master Personnel File. Usually, discipline will be of an increasingly progressive nature, the steps of progression begin:

1. Discussion and counseling
2. Oral reprimand
3. Written reprimand
4. Suspension without pay for a period not to exceed 30 days.
5. Reduction in pay within the pay range of the class or position held.
6. Demotion to a lower class
7. Dismissal

. . .

Disciplinary action steps have been delineated. They should be followed by all departments and agencies in a consistent manner - "when progressive discipline is appropriate" - in order to reduce employee grievances. Supervisors and managers must become familiar with the sequence of steps

- 5 -

to be taken in the discipline process.

Mr. Harris acknowledged that the disciplinary action steps are typically progressive in nature but stated "[t]here are instances where you can skip a step or two." He explained that skipping steps in discipline is permitted so "long as it is consistent." He acknowledged that, in this case, certain steps of discipline had been skipped, and termination was implemented instead. However, he stated that he had "an explanation for that." He stated that "there are certain reasons you would elevate to the next step [of discipline]." As an example, he stated:

> [s]ay you were an officer, and you ticketed somebody, and you got in an argument. Yes, you get a written [form of discipline] and [would] be suspended maybe. But if you shot ten people, then, obviously, they aren't going to sit there and say let's suspend you for ten days. We are going to do termination.

He further explained that the County is "required to follow the steps as best as possible in the situation. Depending on that situation, you have the ability to skip a step." He stated that in the present situation, he believed that the circumstances warranted the skipping of disciplinary steps.

Ms. Bryant was the final witness to testify. Ms. Bryant explained the circumstances surrounding each of the events that led to an issuance of discipline. She began by recounting the incident in which she experienced a $100 shortage while working at the Trustee's Whitehaven location. She explained that she reported the shortage, filled out certain paperwork, and repaid the $100 in accordance with county policy at the time. She received an oral reprimand as punishment. When asked about the circumstances surrounding this incident, she explained that shortly before it occurred, the Trustee's office had stopped using "kiosk machines," which permitted many taxpayers to pay without interacting with a cashier. She claimed that when this stopped, there was a significant increase in the number of customers she served per day. She stated that after "the kiosks were taken away, the traffic was too much."

She next discussed the two shortages that took place on February 27, 2019, and totaled $500. She explained that this incident had occurred on an extremely busy day during which she served approximately 180 taxpayers. She stated that "[i]t was, I believe, the biggest day the County had ever had like that before." She claimed that it was an overwhelmingly busy and "chaotic" day, and this contributed to the shortage she experienced.

Ms. Bryant next detailed the events leading to her insubordination. She first requested security during an end-of-season review meeting with Mr. Joseph Lee and Ms. Maness. She explained that she was concerned about her safety and transporting cash

- 6 -

deposits to the bank alone. She informed them that "[she] just could not continue to do that; it just was – it was too frightening, and it just got to be too much. It was too much money." She claimed that she told Mr. Lee about her anxiety and some previous muggings of which she had been a victim. She stated that she had been mugged once when she was 19 years old and a second time in approximately 2015.[2] However, she acknowledged that she did not inform any of her other superiors of the mugging incidents until the date of the insubordination incident. She maintained that she had been informed that she would receive an escort while working at the Germantown location. However, when she arrived in Germantown, she was told that no security was available. She stated that she was told the County, "if they had someone available, that they would walk with [her] to the car." She called Mr. Lee to discuss the issue but nonetheless, took the payments to the bank without an escort. At this point, it was determined that either Mr. Lee or Ms. Maness would accompany her to the bank. For several weeks, Ms. Bryant worked each Monday at the Germantown location and would be informed that no one was available to escort her to the bank. Regardless, she made the deposit each day. She acknowledged that this led to the phone call with the Trustee. She stated that she informed the Trustee she was upset about the situation and likely cried. However, she denied having said anything inappropriate though she acknowledged that she may have "said something loudly." She denied having done anything to constitute insubordination. She noted that she received an escort from the Germantown Police Department when transporting deposits on the following four Mondays.

Next, Ms. Bryant discussed the circumstances surrounding the February 2020 shortage. She conceded that she experienced the shortage and explained it caused her to panic. When asked about her response, she claimed that she felt like she had nobody "to go to" and "everybody was wanting to get rid of [her] or not wanting to help [her]." She did not deny Ms. Maness's account of the events and admitted she attempted to force balance using her own money. She explained that she was informed a computer glitch had occurred but was never told how the situation was resolved. Rather, Mr. Harris informed her that she was being suspended while they "research[ed] the situation."

On cross-examination, Ms. Bryant was asked whether Ms. Maness had provided her with techniques to help her avoid incurring shortages. She agreed that she had been provided with the techniques but claimed she had not refused to implement them. Rather, she explained that it "took [her] awhile to get that into [her] routine of cashiering." She did concede that Ms. Maness wanted her to perform her job in a certain way, "but it wasn't for [her]." She claimed that despite preferring her own methods, she did eventually adopt Ms. Maness's techniques. Ms. Bryant was also asked about her conversation with the Trustee in more detail. She was asked whether she thought an employee informing an elected official that they "are going to do what [they] are told to do but, quote, this will be the last time that I do it" constituted insubordination. Ms. Bryant responded, "[n]ot under

---

[2] Ms. Bryant was 65 years old at the time of the trial.

the circumstances at all to which I was put in." She claimed that she had treated everyone with respect. She pointed to the fact that she had informed them multiple times of the need for security as the factor leading to this issue. This concluded the hearing.

The Board submitted its findings of fact on May 6, 2021. The Board determined "that the Trustee's Office had no lesser restrictive disciplinary action other tha[n] termination to render to Ms. Bryant" and upheld the termination. Ms. Bryant filed a "Petition for Judicial Review and Issuance of Writ" in the Shelby County Chancery Court on July 2, 2021. The chancery court conducted a hearing on May 10, 2023, and subsequently entered its written order on May 28, 2024, in which it upheld the Board's decision.[3] Ms. Bryant filed this appeal.

## II. Issues Presented

Ms. Bryant has presented the following issues on appeal, which we have slightly reframed:

1. Whether Ms. Bryant's procedural due process rights were violated by insufficient notice.
2. Whether Ms. Bryant's termination was unlawful due to the failure of the trustee's office to comply with the written policies and procedures of Shelby County.
3. Whether the Board's decision to uphold the termination was arbitrary and capricious.

For the following reasons, the judgment of the chancery court is affirmed.

## III. Discussion

### A. Standard of Review

An appellate court reviews "the decision of a civil service merit board 'affect[ing] the employment status of a county or civil service employee'" in accordance with "the standard of review outlined in the Uniform Administrative Procedures Act ("UAPA")." *Moss v. Shelby Cnty. Civ. Serv. Merit Bd.*, 665 S.W.3d 433, 440 (Tenn. 2023) (quoting Tenn. Code Ann. § 27-9-114(b)(1) (2000 & Supp. 2013). Importantly, "the UAPA provides a more narrowly circumscribed standard" of review than the "'broad standard of review used in other civil appeals.'" *Id.* (quoting *Tenn. Dep't of Corr. v. Pressley*, 528 S.W.3d 506, 512 (Tenn. 2017)). Under the UAPA standard of review in place at the time that Ms. Bryant received her written notice of termination:

---

[3] It is unclear from the record why such a long period of time elapsed between the date of the hearing and the issuance of the chancery court's final order.

[t]he court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h)(2019).

As our Supreme Court has previously explained, "[r]eviewing courts may only reverse, remand, or modify civil service merit board decisions 'for errors that affect the merits of such decision.'" *Moss*, 665 S.W.3d at 440 (quoting Tenn. Code Ann. § 4-5-322(i)). Further, "the UAPA's standard of review 'reflects the general principle that courts should defer to decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise.'" *Id.* at 441 (quoting *StarLink Logistics Inc. v. AAC, LLC*, 494 S.W.3d 659, 669 (Tenn. 2016)). "Although [this Court's] review of the Board's factual findings is confined to the provisions of Tennessee Code Annotated section 4-5-322, [this Court's] review of matters of law is *de novo* with no presumption of correctness." *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 264 (Tenn. 2009) (citing Tenn. R. App. P. 13(d)).

**B. Due Process**

Ms. Bryant first claims that her procedural due process rights were violated because "the information given to her did not properly give her notice under *Loudermill*." The United States Supreme Court decision in *Cleveland Brd. of Educ. v. Loudermill* established that, in accordance with the principles of due process, a public employee who can be discharged only for cause must be provided notice and an opportunity to respond to the

charges against him or her prior to termination. 470 U.S. 532, 546 (1985). *See also Moss v. Shelby Cnty. Civ. Serv. Merit Bd.*, 597 S.W.3d 823, 824 n.3 (Tenn. 2020). As our Supreme Court has previously explained:

> [u]nder the Fourteenth Amendment to the United States Constitution, no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This Court has held that Article I, section 8, of the Tennessee Constitution provides similar protections. *Lynch v. City of Jellico*, 205 S.W.3d 384, 391 (Tenn. 2006) (citing *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 711 n.4 (Tenn. 2003)) (recognizing that Article I, section 8 of the Tennessee Constitution "is synonymous with the due process provisions of the federal constitution"). . . .

> The most fundamental element of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). "[N]otice and opportunity for [a] hearing appropriate to the nature of the case" must precede the "deprivation of life, liberty or property." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties" of the claims against them. *Id.* at 314, 70 S.Ct. 652 (citations omitted). Due process requires notice to give affected individuals an opportunity for adequate preparation before an impending hearing. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

> Under the standard set by *Loudermill*, [appellate courts] review[ ] pre-termination and post-termination procedures "in tandem" to determine whether the public employer satisfied the requirements of due process. *See Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 231-32 (Tenn. 2010) (citing *Carter v. W. Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985); *Case v. Shelby Cnty. Civil Serv. Merit Bd.*, 98 S.W.3d 167, 173 (Tenn. Ct. App. 2002)). "Elaborate procedures at one stage may compensate for deficiencies at other stages." *Phillips v. State Bd. of Regents of State Univ. & Cmty. Coll. Sys. of Tenn.*, 863 S.W.2d 45, 50 (Tenn. 1993) (citing *Bignall v. N. Idaho Coll.*, 538 F.2d 243, 246 (9th Cir. 1976)). The question before us is whether [the employee] received adequate notice from the pre-termination and post-termination procedures of the grounds on which the Board upheld the [public entity's] decision to terminate [her] employment.

*Moss*, 597 S.W.3d at 831. Ms. Bryant claims that the pre-termination Loudermill letter, the Loudermill hearing, and the termination letter she received after the Loudermill hearing were too vague to adequately notify her of the charges against her.[4]

Regarding the Loudermill notice, Ms. Bryant claims that it failed to place her on notice because it did not contain the "instances of errors, issues, dishonesty in transactions, when the alleged shortages took place, or the nature of the alleged insubordination." However, while the events in the letters are not associated with specific dates, enough information was provided to alert a reasonable person of the events being referenced. *See Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 683 (Tenn. Ct. App. 2018) (explaining in the context of a teacher tenure matter that it is not necessary for notice of discipline "to give a specific date or to give extensive details about" the incidents being considered in order for the requirements of due process to be satisfied). The letter was sent immediately following the February 2020 cash shortage. Ms. Maness testified that the letter was intended to serve as the disciplinary notice for the incident. Further, the letter specifically limited the additional issues being considered to those which had "occurred in [her] work that were reviewed with [her] on multiple occasions over the [preceding] year." The letter also noted that several instances of conduct were being considered "including multiple cash shortages, dishonesty in transaction activity, inability to follow Standard Operating Procedures set in place when handling tax payer [sic] payments, and insubordination to management, leadership and elected officials in the process of correcting issues." Even if the letter could have been more specific regarding the conduct being considered, it was not so vague that a reasonable person would have been unaware of the incidents being considered. It was sent in direct response to the February 2020 outage and described the events of the preceding year in a fashion that would apprise a reasonable person of the likelihood of those events being discussed.

Ms. Bryant also raises issues with the Loudermill hearing itself. She points to the lack of a record of the hearing and to the lack of testimony explaining its events. However, Ms. Bryant has not explained how the Loudermill hearing was deficient; she has only raised issue with the fact that little testimony was brought in regarding the details of the hearing. She is correct that little testimony came in on the issue. However, Ms. Bryant's counsel was provided with the *opportunity* at the hearing before the Board to elicit testimony from the three people who participated in the Loudermill hearing: Ms. Maness, Mr. Harris, and Ms. Bryant herself. Counsel refrained from doing so. Further, Ms. Bryant never claimed that she was unaware of the charges levied against her during the Loudermill hearing. The only evidence on the matter indicates that she was aware. The post-hearing termination letter states that Ms. Bryant "appeared, accepted, acknowledged, and apologized for [her] actions and performance." Ms. Bryant has not demonstrated that the events that took place during her Loudermill hearing deprived her of "the opportunity to be heard 'at a meaningful

---

[4] The parties do not dispute the fact that Ms. Bryant held a property interest in her continued employment.

time and in a meaningful manner.'" *Moss*, 597 S.W.3d at 831 (quoting *Mathews*, 424 U.S. at 333).

Ms. Bryant also claims that the termination letter she received did not include enough detail regarding the basis for her termination. She has not explained how this letter prevented her from forming a defense against the charges discussed at the hearing before the Board. The letter specifically states that discipline was predicated on Ms. Bryant's "[i]nability to perform the duties of [her] position in a satisfactory manner over a course of employment." When this information is considered alongside the information provided in the Loudermill letter, it is clear that the issues stemming from the February 2020 shortage were those being contemplated.

Ms. Bryant has also failed to acknowledge the post-termination procedures she was afforded. *See Moss*, 597 S.W.3d at 831 ("Under the standard set by *Loudermill*, this Court reviews pre-termination and post-termination procedures 'in tandem' to determine whether the public employer satisfied the requirements of due process.") In this case, the post-termination proceedings were formal and substantial. Ms. Bryant received a full hearing before the Board. She was permitted to present evidence, testify on her own behalf, cross-examine the witnesses called by the County, and present her legal and factual arguments as to why she believed termination was inappropriate. Ms. Bryant was clearly prepared to discuss both the incident serving as the basis for her termination, and each of the preceding disciplinary incidents. *See id.* at 832 (noting that the employee's "tactical decisions" during the post-termination hearing evidenced an intent to challenge the conclusions regarding the conduct serving as the basis for his termination). Ms. Bryant provided detailed testimony regarding each incident. She provided additional context and details she felt were important to explain why these incidents should not have resulted in her termination. Further, her counsel asked pertinent questions and sought to introduce evidence relevant to these incidents. At no time did Ms. Bryant or her counsel claim they were surprised by or unaware of the incidents being discussed. These procedures were then reviewed by the chancery court, and no error was discerned. Taking all the pre-termination and post-termination procedures into account, Ms. Bryant was clearly afforded "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Moss*, 597 S.W.3d at 831 (quoting *Mathews*, 424 U.S. at 333). She was clearly prepared to argue against the charges brought before her, and this was performed in a competent manner. Therefore, we find her contention that her due process rights were violated to be without merit.

### C. Policies and Procedures

Ms. Bryant also claims that the County failed to follow its own policies and procedures. Specifically, she claims that the County failed to explain the deviation from the progressive discipline procedures set out in Policy 703. Ms. Bryant acknowledges that she received the first three levels of progressive discipline. However, she claims that any punishment for the February 2020 shortage should have been limited to a suspension

without pay for a period not to exceed 30 days, the fourth step of progressive discipline listed in Policy 703.

Importantly, the policy itself states, "*Usually*, discipline will be of an increasingly progressive nature[.]" (emphasis added). Mr. Harris testified that the County is permitted to skip steps of discipline "as long as it is consistent." Ms. Bryant's counsel acknowledged at oral argument for this appeal that she was "not arguing that there is no discretion under 703" but rather a "rational basis" as to why termination was justified is required. Counsel later stated that "policy 703 allows for discretion but not arbitrary discretion and there must be a reason to skip steps." Ms. Bryant contends that the County did not properly explain its reasons for skipping disciplinary steps. She acknowledges that Mr. Harris did provide an explanation as to why disciplinary steps could be skipped but asserts his explanation was not appropriate.[5] Ms. Bryant also claims that because Mr. Harris never "confirmed that the discipline in Ms. Bryant's case . . . was consistent with the application of Policy 703 in other departments," the termination was not in accordance with Policy 703. Ms. Bryant further claims that she did not receive a "written write-up" for the February 2020 shortage in further violation of Policy 703.

First, we consider Ms. Bryant's claim that Mr. Harris did not properly explain that her termination was consistent with discipline meted out to other employees in similar situations. Ms. Bryant did not raise this issue during the hearing before the Board. The issue is mentioned nowhere in the transcript of the hearing. Additionally, the issue of consistency does not appear to have been raised before the chancery court. The issue is not referenced in the transcript of evidence detailing the arguments made before the chancery court or in the writ of certiorari submitted to the chancery court.

---

[5] Ms. Bryant also appears to claim that her receipt of both an oral reprimand and period of probation for the February 27, 2019 shortage constituted an impermissible double punishment for one offense. *See Cope v. Tennessee Civ. Serv. Comm'n*, No. M2008-01229-COA-R3-CV, 2009 WL 1635140, at *6 (Tenn. Ct. App. June 10, 2009). However, Ms. Bryant's probationary status is not the subject of this appeal. The probation was not referenced in any of the notices or findings as a basis for her termination or a reason why other progressive disciplinary steps were skipped. It is unclear from her brief what remedy she would seek in having the probation overturned, but it would not result in the reversal of the Board's decision as the fact was given no weight in the written findings of fact. *See* Tenn. Code Ann. § 4-5-322(i) ("No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.") Additionally, the probation issue was not raised at the hearing before the Board. The underlying incident was certainly referenced as one of the incidents considered in calculating the appropriate punishment for the February 2020 incident, but this was permissible. *See White v. Shelby Cnty. Bd. of Educ.*, No. W2023-01226-COA-R3-CV, 2024 WL 5153580, at *11 (Tenn. Ct. App. Dec. 18, 2024) (considering previous acts of misconduct for which a tenured schoolteacher had already received punishment in determining the appropriate level of punishment for a subsequent offense); *Finney*, 576 S.W.3d at 689-90 (determining that a tenured schoolteacher's restraint of a special education student could not serve as the grounds for her later termination as she had already been punished by a three-day suspension for the incident, but "her conduct on this and other occasions [could] be considered when determining the appropriate disciplinary action" for a later incident).

As our Supreme Court has previously explained, "[o]ne appearing before an administrative tribunal must make timely objections to procedural errors and must raise the errors at the administrative level in order to preserve them for consideration in a petition for judicial review." *McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 690 (Tenn. 1996). The Court further stated that a party to an administrative proceeding was required "to raise issues of procedural irregularity" in the same way as "a party in a judicial proceeding" in order to provide the administrative body with "the opportunity to correct procedural errors." *Id.* Tennessee Courts have often determined that failure to do so constitutes waiver of an issue. *See Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 152 (Tenn. 2017) (explaining that "[a]llowing a party to hide an ace up her sleeve for appeal would undermine fair play and finality of judgment" and "our reaffirmed insistence upon contemporaneous objections to agency errors should provide incentive for litigants to see that all procedural deficiencies are addressed before the administrative body completes its consideration of a dispute"); *Bailey*, 303 S.W.3d at 237-38 (finding that a teaching assistant who had the opportunity to raise an "objection to the procedures Defendants utilized in conjunction with dismissing him" at an administrative proceeding but failed to do so until he filed a case in circuit court had waived the issue).

Here, Ms. Bryant did not address the issue of whether her discipline was consistent with other employees before the Board. She did not provide any evidence demonstrating that the discipline she received was inconsistent with previous disciplinary actions taken against others being charged with similar offenses. Additionally, Ms. Bryant's counsel had the opportunity to question Mr. Harris and Ms. Maness about whether the discipline Ms. Bryant received was consistent with past discipline of other employees. No testimony was elicited on the issue. Addressing this issue on appeal would run contrary to the principle that "[o]ne appearing before an administrative tribunal must make timely objections to procedural errors and must raise the errors at the administrative level in order to preserve them for consideration in a petition for judicial review." *McClellan*, 921 S.W.2d at 690. Therefore, the issue is waived.[6]

As for her challenge to the explanation, there was evidence submitted explaining why certain disciplinary steps were skipped. Ms. Maness explained that several incidents had previously taken place and noted that Ms. Bryant's insubordination had resulted in her being issued a "final warning." She stated that the February 2020 error was critical, and when considered alongside the final warning and Ms. Bryant's failure to adopt Ms.

---

[6] Likewise, on appeal, Ms. Bryant has not explained why the failure of Shelby County to follow its policies and procedures should result in the reversal of her termination. This section is clearly separate from that claiming the termination was arbitrary and capricious. Similarly, while she cites *Boyd v. City of Memphis* to support her claims on this issue, she has not raised an equal protection claim as the employee in *Boyd* did. No. W2023-01109-COA-R3-CV, 2024 WL 3984020, at *6 (Tenn. Ct. App. Aug. 29, 2024). She has neither identified equal protection as the basis for her claim nor raised the various components of such a claim.

Maness's techniques, warranted termination. Mr. Harris expressed a similar sentiment and explained that there was no other role available that would have constituted a suitable demotion. Further, while the example may have been a bit extreme, Mr. Harris explained that certain actions warrant greater levels of discipline. Additionally, Ms. Bryant clearly received a written disciplinary notice for the February 2020 shortage. Ms. Maness explained that the Loudermill notice itself was intended to serve this purpose. The letter was sent immediately after the February 2020 shortage and describes itself as a "NOTICE OF PROPOSED MAJOR DISCIPLINE" in the subject line.

The Board clearly accepted the reasons submitted by Ms. Maness and Mr. Harris as viable explanations for skipping levels of discipline. The Board also noted Ms. Bryant's refusal to implement the techniques provided by Ms. Maness as a factor indicating that termination was appropriate. Given our standard of review, we will not substitute our judgment for that of the Board. *See StarLink Logistics Inc.*, 494 S.W.3d at 669.

### D. Arbitrary and Capricious

Finally, Ms. Bryant claims that the decision to terminate her was arbitrary and capricious because it was unsupported by substantial and material evidence. As our Supreme Court has previously explained:

> [a] decision of an administrative agency is arbitrary or capricious when there is no substantial and material evidence supporting the decision. *Pittman v. City of Memphis*, 360 S.W.3d 382, 389 (Tenn. Ct. App. 2011); *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n.*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993). The statute does not define "substantial and material evidence," but it is less than a preponderance of the evidence, *Wayne Cnty.* [*v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)] (citing *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)), and more than a "scintilla or glimmer" of evidence, *id.* (citing *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 390 S.W.2d 461, 463 (1965)). A decision with evidentiary support can be arbitrary or capricious if it amounts to a clear error in judgment. *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007) (citing *Jackson Mobilphone Co.*, 876 S.W.2d at 110). A decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Civil Serv. Comm'n*, 216 S.W.3d at 316 (quoting *Jackson Mobilphone Co.*, 876 S.W.2d at 111). "If there is room for two opinions, a decision is not arbitrary or capricious if it is made honestly and upon due consideration, even though [a reviewing court] think[s] a different conclusion might have been reached." *Bowers v. Pollution Control Hearings*

- 15 -

*Bd.*, 103 Wash.App. 587, 13 P.3d 1076, 1083 (2000) (citing *Buechel v. Dep't of Ecology*, 125 Wash.2d 196, 884 P.2d 910, 915 (1994) (en banc)) (explaining the "arbitrary or capricious" standard under Washington's version of the Uniform Administrative Procedures Act). The "arbitrary or capricious" standard is a limited scope of review, and a court will not overturn a decision of an agency acting within its area of expertise and within the exercise of its judgment solely because the court disagrees with an agency's ultimate conclusion. *See id.* (citing *Buechel*, 884 P.2d 910 at 915)).

*StarLink Logistics Inc.*, 494 S.W.3d at 669-70.

Ms. Bryant argues that her termination was arbitrary and capricious because the Board did not properly consider the circumstances surrounding the instances of misconduct that led to her termination. For clarification, the only charge for which Ms. Bryant is being disciplined in this matter is the shortage that occurred in February 2020. However, the discussion of the other incidents requiring discipline is pertinent and appropriate as previous disciplinary incidents may be considered when determining the appropriate level of punishment for a subsequent offense. *See White*, 2024 WL 5153580, at *11; *Finney*, 576 S.W.3d at 689-90. Ms. Bryant claims that she was not insubordinate to the Trustee but had requested a "reasonable accommodation" and had merely become upset when discussing the issue. She also points to the circumstances surrounding her various cash shortages, including very long lines due to the removal of the kiosk system and the computer malfunction, as mitigating factors that should have been considered. She further claims that the Board placed undue emphasis on Ms. Maness's claims to have provided techniques to attempt to alleviate these issues. She also argues that the Board should have given more weight to the positive performance reviews she received in 2017, 2018, and 2019.

Importantly, Ms. Bryant has never denied the February 2020 shortage that led to her termination. She acknowledged that the shortage occurred and admitted she attempted to force balance to conceal this fact. Thus, the only question is whether the circumstances cited by Ms. Bryant rendered the Board's determination a clear error of judgment. In our view, the Board's decision was clearly supported by evidence "that would lead a reasonable person to reach the same conclusion." *Civil Serv. Comm'n*, 216 S.W.3d at 316 (quoting *Jackson Mobilphone Co.*, 876 S.W.2d at 111).

Ms. Bryant attempted to explain each of the incidents considered in the formulation of her punishment, but she has not demonstrated that the Board's decision to weigh them against her was unreasonable. Ms. Bryant claimed that the 2019 shortages were caused by extremely busy working conditions. While we are sympathetic to these busy conditions, a reasonable person could nonetheless deem her to have been at fault. Likewise, she has not denied that she was out-of-balance on the dates in question. Similarly, while Ms. Bryant stated she did not believe she was insubordinate, she admitted that she informed a direct

- 16 -

superior she would not perform a job duty. She was punished for this and did not challenge the punishment until after her termination. It was reasonable to consider this incident when assessing the appropriate punishment. The incident is especially pertinent because it resulted in Ms. Bryant being sent a "final warning" from the Trustee herself explaining that any subsequent issues would result in "disciplinary action up to and including termination." It was also reasonable to consider Ms. Maness's attempts to help Ms. Bryant avoid shortages and Ms. Bryant's unenthusiastic response.

Further, Ms. Bryant's claim that her positive performance reviews render the Board's decision arbitrary and capricious is unconvincing. Two of the performance reviews cited by Ms. Bryant were for her performance in years prior to 2019, the year identified in the termination letter as the year in which the events being considered began to take place. Therefore, those performance reviews are of little value to the present proceedings. Additionally, while the 2019 performance review was positive, this does not render the Board's decision illogical. It is not such convincing evidence rendering the decision to terminate Ms. Bryant unreasonable or arbitrary.

The evidence provided in this matter certainly constitutes that which is necessary to uphold the Board's decision given our deferential standard of review. The Board's line of reasoning in this matter was clear and logical. The Board was aware that the shortage took place in February 2020 and was the basis of discipline. The Board was also aware of the events surrounding Ms. Bryant's employment and clearly took them into account when reviewing her termination. Despite Ms. Bryant's testimony, the Board decided that termination was appropriate. This was reasonable. Therefore, we affirm.

## IV. Conclusion

For the foregoing reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to the appellant, Betty Malia Bryant, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE